IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-75,879






JUAN LIZCANO, Appellant



v.



THE STATE OF TEXAS







Appeal from Case F05-59563-QS of the 

282nd Judicial District Court of 

Dallas County





 Womack, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Keasler, Hervey, and Cochran, JJ., joined. Price, J., filed a
concurring and dissenting opinion, in which Holcomb and Johnson, JJ., joined.



 A jury convicted Juan Lizcano of capital murder on October 9, 2007. Pursuant to the
jury's findings on special issues about future-dangerousness, mitigation, and mental-retardation,
the trial court sentenced the appellant to death. The appellant now raises seventy-nine points of
error on direct appeal to this Court. (1) Finding no reversible error, we affirm the judgment and
sentence of the trial court.

I. Background 

 The appellant and Jose Fernandez, a friend, spent the evening of Saturday, November 13,
2005, at a dance club in Dallas. Fernandez testified at the appellant's trial that they arrived
around 10:00 or 11:00 p.m. and consumed three beers each, leaving around 1:00 a.m. on Sunday
morning. As the appellant drove them home in his truck, Fernandez overheard the appellant
talking on his cell phone to Marta Cruz, his girlfriend. The appellant told Cruz "if she was with
another person, he was going to kill her. He's going to kill her and him." The appellant then
drove with Fernandez to the apartment the appellant shared with his uncle and brother. The
appellant took his uncle's revolver and continued to Cruz's house. Fernandez stayed in the truck
while the appellant went inside.

 Marta Cruz testified that the appellant knocked on her door around 2:00 a.m. on Sunday
morning. After she let him inside, the appellant pointed the revolver at her head. Then he fired
one shot into the ceiling. Cruz said the appellant told her that "[t]he next shot was for me. That I
was next. The next one was for me." The appellant left the house after about ten minutes. Cruz
immediately called 911. 

 Before the police arrived, Cruz called Fernandez to find out if he knew that the appellant
had a gun. When Fernandez answered, Cruz learned that he was with the appellant. She asked
Fernandez to tell the appellant not to come back to her house because the police were looking for
him. But the appellant called Cruz and told her that he "didn't give a damn. He just didn't care."

 Officer Lori Rangel was one of the officers who responded to Cruz's first 911 call.
Officer Rangel testified that after Cruz described the incident with the appellant, Officer Rangel
searched the surrounding area, but did not find the appellant or his truck. Following the
unsuccessful search, Cruz told Officer Rangel that she did not need anyone to continue waiting
with her, so Officer Rangel left the house. 

 Cruz received another call from the appellant after Officer Rangel left. The appellant said
"that he could see that there was no police. That I was lying." A couple of minutes later, the
appellant began kicking her side door to gain entry. Cruz hid in a closet. She called 911 while the
appellant continued trying to kick through the door. Eventually, police officers arrived at Cruz's
house and the appellant's kicking stopped. 

 Several police officers testified about the events following Cruz's second 911 call.
Officer David Gilmore saw the appellant run from the back yard into an alley behind the house.
Several officers then searched the alley. A marked police vehicle led officers on foot, and a
police helicopter hovered above. Officers Brad Ellis, Richard Rivas, Francis Crump, and
Raymond McClain described scrambling for cover as the appellant fired at least three shots at
them from behind a tree in the alley. The appellant then ran from the alley, toward the front of the
house.

 While other officers searched the back alley, Officer Brian Jackson took an AR-15 rifle
from his police vehicle and moved into a position at the front of the house. After the appellant
ran to the front of the house, officers heard the appellant's revolver fire one shot, followed by
Officer Jackson's rifle firing three shots. As the officers converged on the front yard, they found
Officer Jackson fatally wounded and the appellant lying on the ground behind a trash can. His
revolver lay empty on the ground two or three feet from his head. According to Chief Medical
Examiner Dr. Jeffrey Barnard, the appellant's shot traveled through Officer Jackson's right arm
and then into his heart, killing him within ten to fifteen seconds.

 At trial, the appellant did not contest that he had fired the fatal shot. He did, however,
challenge the State's theory that he fired first and that he knew Officer Jackson was a police
officer.

II. JURY SELECTION 

A. Batson Challenges

 In points of error one through six, the appellant argues that the State exercised
peremptory challenges to strike six black venire members in violation of the Equal Protection
Clause of the United States Constitution and Batson v. Kentucky. (2) In Batson, the United States
Supreme Court held that while a prosecutor ordinarily may exercise peremptory challenges for
any reason related to his views concerning the outcome of the trial, "the Equal Protection Clause
forbids the prosecutor to challenge potential jurors solely on account of their race ...." (3) The
Supreme Court articulated the procedure for bringing a Batson challenge in Purkett v. Elem (4):

 Under our Batson jurisprudence, once the opponent of a peremptory challenge has
made out a prima facie case of racial discrimination (step one), the burden of
production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial
court must then decide (step three) whether the opponent of the strike has proved
purposeful racial discrimination. (5)

1. Standard of Review

 The ultimate burden of persuasion rests with the opponent of the strike to establish by a
preponderance of the evidence that the strike was the product of the proponent's purposeful
discrimination. (6) The appellant concedes that the State offered race-neutral explanations for the
six challenged venire members, but argues that the trial court erred because the State's
explanations were a pretext for racial discrimination. Therefore, the only issue before us is
whether the trial court erred in finding that the appellant did not prove purposeful racial
discrimination by a preponderance of the evidence. 

 On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained
unless it is clearly erroneous. (7) This deferential standard of review is due to the trial court's ability
to make determinations about an attorney's credibility and demeanor: "Step three of the Batson
inquiry involves an evaluation of the prosecutor's credibility and the best evidence of
discriminatory intent often will be the demeanor of the attorney who exercises the challenge." (8)

 2. Analysis This Court has identified a number of relevant factors that may be considered by a trial
court in determining discriminatory intent. (9) The appellant argues two of these factors on appeal:
(a) the State disproportionately eliminated black venire members in striking six out of the eight
black venire members on the qualified panel of forty-seven total venire members, and (b) the
answers given by the stricken black venire members in response to voir dire questioning were
similar to answers given by non-black venire members who were not struck.

a. Proportionality of Strikes

 The record from the Batson hearing conducted by the trial court indicates that a total of
forty-seven venire members were found qualified after individual voir dire. Of these forty-seven,
eight were black, thirty-two were white, six were Hispanic, and one was of an "other" race. (10) The
State exercised peremptory challenges against six black, seven white, two Hispanic, and the one
"other" venire member. The appellant exercised peremptory challenges against no black, sixteen
white, and two Hispanic venire members. Ultimately, the jury consisted of two black, eight
white, and two Hispanic jurors and one white alternate juror. (11)

 The appellant encourages us to determine proportionality by simply comparing the
number of black venire members struck by the State to the total number of black venire
members: 6 of 8, or 75%. (12) The State would have us compare the number of black jurors to the
total number of jurors plus the alternate juror (2 of 13, or 15%), and compare that percentage
with the percentage of black jurors that would be expected from a random selection from the
qualified venire (8 of 47, or 17%). (13) We also could analyze the data using a number of other
statistical techniques found in decisions of the United States Supreme Court and this Court. (14)

 The parties have not provided analysis of why any one technique would be preferable to
determine proportionality under the facts of the present case. Because the record does not
indicate which, if any, of these techniques the trial court relied upon, we will not decide which
technique is preferable. (15) Instead, we simply observe that certain techniques yield statistics
favoring the appellant and certain techniques yield statistics favoring the State. Therefore, this
factor does not support the appellant's contention that the trial court's ruling was clearly
erroneous, and we look next to the appellant's comparative juror analysis. 

b. Comparative Juror Analysis

 The United States Court of Appeals for the Fifth Circuit recently extracted key principles
from the United States Supreme Court decision in Miller-El v. Dretke to help guide comparative
juror analyses:

 First, we do not need to compare jurors that exhibit all of the exact same
characteristics. If the State asserts that it struck a black juror with a particular
characteristic, and it also accepted nonblack jurors with that same characteristic,
this is evidence that the asserted justification was a pretext for discrimination,
even if the two jurors are dissimilar in other respects. Second, if the State asserts
that it was concerned about a particular characteristic but did not engage in
meaningful voir dire examination on that subject, then the State's failure to
question the juror on that topic is some evidence that the asserted reason was a
pretext for discrimination. Third, we must consider only the State's asserted
reasons for striking the black jurors and compare those reasons with its treatment
of the nonblack jurors. (16)


 The primary reason asserted by the State for striking five of the six black venire members
at issue was that they were among eight venire members who circled a specific answer to a
specific question on the jury questionnaire. The answer indicated that, although they did not
believe that the death penalty ever ought to be invoked, as long as the law provides for it they
could assess it under the proper circumstances. A venire member's responses to a written
questionnaire can be valid grounds for a peremptory challenge. (17) Because the State struck all
eight venire members who shared the characteristic of circling this answer, including three non-black venire members, the appellant has not demonstrated that the State's reason for striking
those five black venire members was a pretext for discrimination.

 The State offered four reasons for striking the sixth black venire member, R. Howard: (i)
he preferred a sentence of life in prison to the death penalty; (ii) he was argumentative and
became alienated during voir dire; (iii) he would hold the State to a burden of proof higher than
beyond a reasonable doubt; and (iv) he would prefer a sentence of life in prison if the evidence of
guilt was sufficient, but weak. The appellant argues that the record does not support the State's
reasons and that Howard's responses to voir dire questioning suggest that he would have been a
strong juror for the State.

 Our review of the record reveals that there is evidence supporting the State's reasons for
striking Howard; indeed, the State attempted to challenge Howard for cause on the basis of the
third and fourth reasons. More importantly, the appellant has failed to identify any non-black
jurors with characteristics similar to Howard who were not struck by the State, thus providing no
comparison. As the appellant bears the burden of persuasion, we decline to scour the extensive
record to find an appropriate comparison. 

 Because neither the proportionality nor the comparative-juror-analysis factor weighs in
favor of a finding that the trial court's ruling was clearly erroneous, points of error one through
six are overruled. 

B. Appellant's Challenges for Cause

 In points of error seven through fifteen, the appellant argues that the trial court erred in
denying his challenges of nine venire members for cause. In Johnson v. State, we reaffirmed that
harm arising from erroneous denial of challenges for cause is "demonstrated, and the error held
reversible, when the appellant (1) exercised his peremptory challenges on the venire member
whom the trial court erroneously failed to excuse for cause, (2) exhausted his peremptory
challenges, (3) was denied a request for additional peremptory challenges, and (4) identified an
objectionable juror who sat on the case." (18) Here, the appellant failed to identify an objectionable
juror who sat on the jury at the appellant's trial. 

 At the conclusion of voir dire, the State and the appellant each exercised their full
allotment of fifteen peremptory challenges. In addition, the appellant exercised two additional
peremptory challenges granted by the trial court. When the State and the appellant had exhausted
the last of their peremptory challenges, only nine venire members had been seated as jurors. The
trial court therefore seated the next three venire members: L. Morris, L. Jackson, and A. Perez.

 After the appellant had used his last peremptory strike and before the final three jurors
were seated, the appellant requested additional peremptory strikes but failed to identify an
objectionable juror who sat on the case:

 DEFENSE COUNSEL: Your Honor, we will exercise that peremptory challenge
on Ms. Lee. Your Honor, we will ask an additional peremptory challenge. We are
out of them now and there are jurors that will be placed on the jury that we have
attempted to get off for cause and are objectionable and prejudiced against the
Defendant in violation of his rights under Article one, section ten of the - ten,
fifteen, nineteen and twenty-nine of the Texas Constitution, the Sixth and
Fourteenth Amendment of the United States Constitution, and request extra
strikes - an extra strike, and they were challenged for cause for bias, which we,
you know, brought to the Court's attention, and we would need to use a
peremptory challenge on them to keep them off the jury.

 

 

 

 [I]t is my understanding that per the agreement with the Court and Counsel  that
[Defense Counsel] was allowed to specify her peremptory challenges for people
that were challenged by the Defense for cause and that challenge was overruled by
the trial court, and I think there was a total of seven of them, and beginning with
the first one, going through seven, we would state that the Court erred in not
granting the challenge for cause, and in successive order, we have had to
challenge these people as objectionable jurors that would have ended up on the
jury if we hadn't used peremptory challenges, therefore, using up our peremptory
challenges on jurors that should not have been in the strike zone.

 

 THE COURT: That will be denied. And that results in Morris being juror 10,
Jackson, juror 11, and Perez being juror 12.


Defense counsel's statements do not identify Morris, Jackson, and Perez as objectionable jurors
because the record shows that none of these individuals were challenged by either party for cause
during individual voir dire. Additionally, on appeal, the appellant identifies each of the nine
venire members whom the appellant actually struck as an "objectionable juror" and states that
because the appellant had exhausted his peremptory challenges on these objectionable jurors, he
"was required to accept an 'objectionable' juror on the jury." 

 Ultimately, the appellant failed both at trial and on appeal to identify any specific,
objectionable juror who actually sat on the jury during the trial. Because the appellant has not
established one of the four necessary elements to show harm, we find it unnecessary to review
the merits of the trial court's ruling on each venire member. (19) Points of error seven through
fifteen are overruled. 

C. State's Challenges for Cause

 In points of error sixteen and seventeen, the appellant argues that the trial court erred in
granting the State's challenges for cause of venire members G. Jefferson and N. Miller Phillips.
The appellant argues that these venire members did not exhibit bias and could follow the law. 

 A venire member is challengeable for cause if his beliefs against capital punishment
would prevent or substantially impair the performance of his duties as a juror in accordance with
the court's instructions and the juror's oath. (20) A venire member who can set aside his beliefs
against capital punishment and honestly answer the special issues is not challengeable for
cause. (21) We review a trial court's ruling on a challenge for cause with considerable deference
because the trial court is in the best position to evaluate the venire member's demeanor and
responses. (22) When the venire member's answers are vacillating, unclear, or contradictory,
particular deference is accorded to the trial court's decision. (23) We will reverse a trial court's
ruling on a challenge for cause only if a clear abuse of discretion is evident. (24)

 Jefferson ultimately stated that she could not perform her duties as a juror in accordance
with the juror's oath. During voir dire, Jefferson vacillated about her ability to take the juror's
oath due to her religious beliefs. The trial court then posed several questions directly to her:

 THE COURT: Well, let me ask a few questions. I think you are intelligent
enough - certainly intelligent, and you understand you said some conflict - you
have made some conflicting answers.

 

 [JEFFERSON]: Uh-huh.

 

 THE COURT: You agree with that, don't you, Ms. Jefferson -

 

 [JEFFERSON]: Yes, sir.

 

 THE COURT: - from talking to these lawyers. Let me ask you this and I'll just
leave it at that: To sit on the jury, you have to take that oath that both sides have
been talking to you about, that you can a true verdict render according to the law
and evidence, and that would mean that if the - you believe that the State proved
that the person on trial was guilty beyond a reasonable doubt, that you could find
the person guilty. And if you didn't, you would find the person not guilty.

 

 [JEFFERSON]: Yes, sir.

 

 THE COURT: Can you take the oath and follow the law as to whether or not to
find someone guilty or not guilty.

 

 [JEFFERSON]: I couldn't take it. I can't take the oath, at least not at this time,
without finding out from my church how they feel about that, sir.

 

 THE COURT: Well, we're just not - under our procedure, we can't wait until you
have had an opportunity to talk to your church, so I need a "yes" or "no" answer at
this time.

 

 [JEFFERSON]: No, sir, not at this time.


Because Jefferson vacillated about whether she could impose the death penalty, and ultimately
stated to the trial court that she could not take the juror's oath, the trial court did not abuse its
discretion in granting the State's challenge.

 Miller Phillips was originally examined on June 27, 2007, and also made conflicting
statements with respect to her ability to impose the death penalty. At the beginning of
questioning she stated, "I'm not in favor of  putting someone to death. I'm not in favor of
death under any circumstances. In all honesty, I find it ludicrous that we can't kill stem cells, but
we can kill an individual. That just does not make any sense to me." As questioning proceeded,
however, she indicated that she could perform her duties as a juror. 

 Several weeks after her initial questioning, Miller Phillips contacted the court coordinator
with concerns about her ability to serve on the jury. She subsequently retained counsel and
appeared in court with counsel on September 4, 2007, to inform the trial court that she could not
perform her duties as a juror: "Well, after much thought and deliberations and a great deal of soul
searching, I have concluded that I cannot bring myself to  find another person to death [sic]. I
cannot do that. I find it morally and ethically wrong." Miller Phillips stated further, "I would not
in  good conscience be able to answer [the special issues] in such a way that it would lead to
the death of another human being." She did not waver from this position during further
questioning by defense counsel. 

 Because Miller Phillips expressly informed the trial court that she would be unable to
impose the death penalty, the trial court did not abuse its discretion in granting the State's
challenge. (25) Points of error sixteen and seventeen are overruled. 

D. Lawfully Constituted Jury

 In point of error eighteen, the appellant argues that the errors claimed in points of error
one through seventeen violate the United States Constitution by "depriv[ing] Appellant of a
lawfully constituted unbiased and non prejudicial group of jurors, all of which should have been
qualified according to the law." The appellant also states that our holding in Jones v. State (26) is
"constitutionally illusory erroneous and barbaric in its application." In point of error nineteen, the
appellant repeats point of error eighteen, but substitutes the Texas Constitution.

 As we have found no error in the selection of qualified jurors, points of error eighteen and
nineteen are overruled.

III. MENTAL RETARDATION

A. Psychological Examination

 In points of error twenty and twenty-one, the appellant argues that he was compelled to
submit to a psychological examination conducted by the State in violation of the Fifth
Amendment to the United States Constitution and Article I, Sections 9 and 10 of the Texas
Constitution. The appellant fails to provide any distinction between his state and federal
constitutional arguments. Therefore, we will analyze only his federal claims. (27) 

 In Lagrone v. State, we held that "when the defense demonstrates the intent to put on
future dangerousness expert testimony, trial courts may order defendants to submit to an
independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's
expert testimony." (28) Then in Chamberlain v. State, (29) we discussed the broader principle of
Lagrone:

 [I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces
that testimony which is based on such interview, he has constructively taken the stand and
waived his fifth amendment right to refuse to submit to the State's psychiatric experts.
Appellant cannot claim a fifth amendment privilege in refusing to submit to the State's
psychiatric examinations and then introduce evidence gained through his participation in
his own psychiatric examination. (30)


 The immediate question before us is whether the holding in Lagrone may be extended to
psychological examinations to determine mental retardation. We hold that when the defense
demonstrates the intent to introduce evidence of the defendant's mental retardation through
psychological examinations conducted by defense experts, the trial court may order the defendant
to submit to an independent, state-sponsored psychological examination on the issue of mental
retardation. As we stated in Lagrone, "[o]ur sense of justice will not tolerate allowing criminal
defendants to testify through the defense expert and then use the Fifth Amendment privilege
against self-incrimination to shield themselves from cross-examination on the issues which they
have put in dispute." (31) The precise nature of the psychological testimony to be presented is
immaterial; that it is being presented by the defendant is enough to trigger the rule. (32) 

 The trial in this case began on October 1, 2007. On April 20, 2007, by order of the trial
court, the appellant had filed a declaration of his intent to claim mental retardation as a bar to the
death penalty. On the same day, the State filed a motion to compel the appellant to submit to an
examination by the State's expert to determine whether he was mentally retarded. The trial court
granted the State's motion, and further ordered that (i) the appellant's and State's experts make
the raw test data and notes from their evaluations available to the opposing expert, and (ii)
neither expert disclose the underlying facts or data to the attorneys without prior judicial
authorization. At a pretrial hearing on June 1, 2007, the appellant objected to the examination
primarily on the grounds that it should be conducted only after the appellant had actually
introduced expert testimony on the issue of mental retardation at trial. In response, the trial court
revised its order to prohibit the State's expert from talking with the appellant about the facts of
the underlying offense. The appellant now argues that the examination was unconstitutional, but
does not discuss the timing of the examination. (33) 

 We conclude that the trial court's order did not violate the appellant's Fifth Amendment
rights, particularly where the trial court adopted the prophylactic measures of ordering the
experts not to disclose underlying facts or data to the attorneys without prior judicial
authorization, and ordering the state's expert not to question the appellant regarding the offense.
Points of error twenty and twenty-one are overruled.

B. Pretrial Determination of Mental Retardation

 In point of error twenty-two, the appellant argues that the trial court denied him due
process of law by refusing to empanel a separate jury to make the mental-retardation
determination before trial. In point of error twenty-three, the appellant argues that the trial court
denied him due process of law by refusing to make the mental-retardation determination itself
before trial. In point of error twenty-four, the appellant states that the trial court denied him due
process of law by refusing to allow him to offer evidence of mental retardation before the trial.
Point of error twenty-four is not briefed and is therefore overruled. (34) 

 In Atkins v. Virginia, (35) the United States Supreme Court held that the execution of
mentally retarded persons violates the Eighth Amendment's prohibition of cruel and unusual
punishment, but left to the states the task of developing appropriate ways to enforce this
constitutional restriction. This Court has consistently held that a determination of mental
retardation during the punishment phase of trial is sufficient to protect a defendant's Eighth
Amendment rights. (36) In Neal v. State, we explained that "the nature of the offense itself may be
relevant to a determination of mental retardation; thus, a jury already familiar with the evidence
presented at the guilt stage might be especially well prepared to determine mental retardation." (37)

 The appellant fails to cite any binding authority for the proposition that punishment-phase
determinations of mental retardation are a violation of due process. While his policy arguments
could be considered by the legislature if it chooses to enact a statutory response to Atkins, we
decline to overturn established precedent. Points of error twenty-two and twenty-three are
overruled.

C. Mitigation Report Underlying Expert Opinions

 In point of error thirty, the appellant argues that the trial court erred in requiring the
appellant to produce the facts and data underlying the opinions of his mental-retardation experts
approximately ten days before the appellant called the experts to testify. The appellant also
argues that the facts and data were "work product and not subject to discovery."

 Rule of Evidence 705(a) controls disclosure of facts or data underlying an expert opinion:

 The expert may testify in terms of opinion or inference and give the expert's
reasons therefor without prior disclosure of the underlying facts or data, unless the
court requires otherwise. The expert may in any event disclose on direct
examination, or be required to disclose on cross-examination, the underlying facts
or data. [Emphasis added.]


A trial court is vested generally with broad discretion to conduct a trial. (38) The emphasized clause
"unless the court requires otherwise" provides the trial court with specific discretion to require
the disclosure of facts or data underlying expert opinions prior to the testimony of the expert. 

 The record shows that the appellant's defense counsel hired an investigator, Debbie
Nathan, to conduct interviews to assemble mitigation evidence. Based on these interviews,
Nathan compiled a "mitigation report." When defense counsel decided to pursue a mental-retardation claim, they sent the mitigation report to their mental-retardation experts. The experts
used the mitigation report to form their opinions, and the mitigation report was sent to the State's
expert pursuant to the trial court order discussed above in Section III-A.

 On Wednesday, October 10, the jury heard testimony from several of the appellant's
punishment witnesses. The trial court then dismissed the jury for the weekend, reminding the
jurors that the trial would break again after the Tuesday of the next week. On Thursday, October
11, the trial court ordered defense counsel to disclose facts or data, including the mitigation
report, underlying the opinions of their experts. Defense counsel objected on the grounds that the
State should get the mitigation report only "at the time that the witness is on voir dire preparing
to testify in front of the jury." The trial court overruled the defense objection and explained that it
wanted to avoid further delays in the trial:

 [H]ere's the rule. 705 says, "Prior to the expert giving the expert's opinion that the
State is entitled to take this person on voir dire." It doesn't talk about time frame
or anything else like that.

 

 This case has been delayed, delayed, delayed. I'm not going to run up to October
22nd or 29th now when you plan to call this witness and delay this case any
further, because they're going to want a continuance. They will be entitled to a
continuance to review the information. They simply will be.


 The data is what it is. And  [Defense Counsel], if you do not create or enhance
the substance of information, it ain't work product. So, at this time, I'm ordering
the Defense to turn over the disclosure of facts or data underlying your expert's
opinion that you will be calling to testify.


On Monday, October 15, the trial resumed. In the afternoon of Tuesday, October 16, the jury was
again excused until Monday, October 29. The State conducted a voir dire examination of the
appellant's experts on Wednesday, October 31, and the experts completed their testimony that
day. The trial finally concluded on Thursday, November 1.

 As a preliminary matter, the appellant argues on appeal that the mitigation report was
"work product and not subject to discovery." At trial, however, the appellant conceded that the
mitigation report would have to be disclosed; he argued only that he should not be required to
disclose the mitigation report before the experts were called to testify. The contention that the
mitigation report was "work product and not subject to discovery" was not argued to the trial
court and is not preserved for review. (39)

 The record shows that the trial court ordered the disclosure before the defense experts
were called to testify, but during the presentation of defense witnesses at the punishment phase,
so that the State could review the information while the jury was excused. The trial court could
thereby avoid granting another continuance that would extend the trial further. Under the facts
described above, the trial court did not abuse the discretion provided under Rule 705(a). 
Furthermore, the appellant fails to allege any specific harm arising from the State's possession of
the mitigation report prior to voir dire of the expert witnesses. Point of error thirty is overruled.

D. Mental Retardation Finding

 In point of error forty-nine, the appellant argues that the jury's answer to the mental-retardation special issue is against the great weight and preponderance of the evidence. In points
of error fifty and fifty-one, he argues that the trial court erred in failing to disregard the jury's
answer to the mental-retardation special issue and in denying the appellant's motion for judgment
notwithstanding the verdict. We will address the latter two points first.

 In points of error fifty and fifty-one, the appellant argues that because he introduced
expert witnesses to demonstrate mental retardation and the State did not introduce its own expert
witnesses in rebuttal, the trial court should have disregarded the jury's answer to the mental-retardation special issue or granted his motion for judgment notwithstanding the verdict. (40) In
Gallo v. State, we held that when an affirmative defense of mental retardation is asserted at trial,
a defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is
mentally retarded. (41) We find no authority, however, to support the appellant's contention that
only expert testimony can be used to prove or disprove mental retardation, or that the State had a
burden of production to introduce expert witnesses. In fact, in Ex parte Briseno, we cautioned
that "[a]lthough experts may offer insightful opinions on the question of whether a particular
person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of
whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on
excessive punishment is one for the finder of fact, based upon all of the evidence and
determinations of credibility." (42) Points of error fifty and fifty-one are overruled.

 We now proceed to point of error forty-nine. As noted above, at trial the appellant bore
the burden of proof, by a preponderance of the evidence, to establish that he is mentally
retarded. (43) This Court defines "mental retardation" according to a three-prong test: (i)
significantly sub-average general intellectual functioning, usually evidenced by an IQ score of
about 70 or below, (ii) accompanied by related limitations in adaptive functioning, and (iii) the
onset of which occurs prior to the age of eighteen. (44)
 In reviewing the jury's finding that the
appellant is not mentally retarded, we must consider all of the evidence relevant to the mental-retardation special issue and determine, with great deference to the jury's finding, whether this
finding is so against the great weight and preponderance of the evidence as to be manifestly
unjust. (45)

1. Significantly Sub-Average General Intellectual Functioning

 The appellant's evidence on the first prong of the mental retardation test came from two
expert witnesses who testified that his IQ scores are consistently below 70. Dr. Antonio Puente, a
clinical neuropsychologist and professor of psychology at the University of North Carolina,
administered three IQ tests and reported scores of 62, 60, and 48. Dr. Puente gave his opinion
that the appellant was mildly mentally retarded. He also noted an IQ test performed by defense
expert Dr. Gilbert Martinez that resulted in a score of 69. 

 Dr. Kristi Compton, a psychologist in private practice in Dallas, administered one IQ test
and reported a score of 53. In her opinion, the appellant suffered from mild mental retardation.
Dr. Compton further testified that IQ tests have a standard error of measure of plus or minus five
points. On cross-examination, Dr. Compton confirmed that Hispanic test subjects historically
score 7.5 points lower on IQ tests than Caucasian subjects. She explained, "That doesn't mean
they're less intelligent, it has to do with culture and influence." Dr. Compton indicated that there
was no standard protocol for whether to simply add back 7.5 points to the scores of Hispanic
subjects. She agreed with the State that if the 7.5 points were added, the appellant's IQ scores
would be 55.5, 59.5, 69.5, 67.5, and 76.5. If five additional points were added to reflect the upper
limit of the error of measure, the scores would be 60.5, 64.5, 74.5, 72.5, and 79.5. (46) Dr. Compton
testified on redirect examination, however, that having multiple scores within the same range
gave her additional confidence that the scores were correct and that it would not be proper to
simply add 7.5 and 5 points to each score.

 The State contends on appeal that three considerations should increase the IQ scores
reported by Drs. Puente and Compton. First, "Dr. Compton testified that Spanish speakers tend to
score one-half standard deviation below Caucasians, or 7.5 points, because of 'culture and
influence,' not cognitive deficiency." Second, the standard error of measurement was plus or
minus five points. Third, "case law and the theory of regression to the mean further support
interpreting the results, in this case, so that they trend upward to the mean IQ of 100." 

 The State's contentions have little merit. Whether or not "Spanish speakers" as a group
tend to score below "Caucasians" on IQ tests, has little relevance for the proposition that, on the
tests administered to him, the appellant's scores were somehow inaccurate due to his particular
culture and influences. (47) Furthermore, the State presented no evidence showing why the standard
error of measure of five points should be added to the appellant's score rather than subtracted
from it or even ignored, particularly in light of the testimony from Dr. Compton that the multiple
scores below 70 increased her confidence in the validity of the scores. Finally, the theory of
"regression to the mean" was not presented to the jury, and the State does not indicate how that
theory would logically apply in this case. 

 The appellant clearly satisfied the first prong of the mental retardation definition by a
preponderance of the evidence.

2. Related Limitations in Adaptive Functioning

 To aid our analysis of an appellant's limitations in adaptive functioning, we look to the
definition of "adaptive behavior" in the Health and Safety Code. (48) Section 591.003(1) of the
Health and Safety Code defines adaptive behavior as "the effectiveness with or degree to which a
person meets the standards of personal independence and social responsibility expected of the
person's age and cultural group." The appellant was approximately twenty-eight years old at the
time of the offense, and because neither party presented evidence or argument concerning the
appellant's cultural group, we will consider his cultural group to be simply the people of the State
of Texas. 

 A significant number of witnesses provided testimony relevant to the appellant's adaptive
functioning. The testimony of many of the witnesses, however, provided evidence both for and
against the appellant's claim. The following is a summary of the more relevant testimony:


 Aleida Reyes Lucio taught the appellant for one year in the sixth grade in Mexico. She
described the primitive nature of the appellant's school and testified that the appellant's
"learning was very slow" compared to the other children. The school went up to only the
sixth grade, and she graduated the appellant from the sixth grade because he was 15 years
old, even though the maximum age for a sixth-grade student at that time was between 12
and 13 years of age. During cross-examination, Lucio indicated that her education,
similar to that of other teachers in small schools, extended only through the ninth grade. 
She taught the appellant for one year between 1992 and 1993.

 Rosa Maria Rodriguez Rico was a nurse in the region where the appellant was raised. 
She testified that women in that region often did not have prenatal care and that the
appellant's nutrition as a child was "totally deficient." On cross-examination, she
conceded that she first met the appellant approximately ten years prior to the trial when
he was around the age of 21, and that she treated him for the flu.

 Jessica Baron dated the appellant for five or six months in 2005. She testified that on
several occasions the appellant drove to visit her in Wichita Falls. Before the first such
trip, she gave the appellant explicit directions from Dallas to her house, but the appellant
had to call her several times because he got lost. She also came to visit the appellant in
Dallas, where he lived with his uncle and brother. Baron testified that the appellant was
shy. When asked a question, "[h]e would answer simply, but that's probably it." She and
the appellant would talk almost every night; he had a basic Spanish vocabulary, but she
never heard him speak in English. The appellant would always pay for meals when they
went out to eat, but she never recalled seeing him count any change after paying. On
cross-examination, Baron testified that the appellant did not need directions after his first
trip to Wichita Falls. She did not consider him to be slow or mentally retarded, but rather
to be shy around crowds. She said, "He was very bright. He didn't have any problems
understanding me."

 Alejandra Ruiz Campos is the appellant's mother. She described the appellant's
childhood home in Mexico and testified that the appellant left Mexico and came to the
United States so that he could send money home. The appellant would typically send
money home every 15 days.

 Reyes Lizcano Ruiz is one of the appellant's older brothers. He testified that he and the
appellant worked at a community store when the appellant was nine or ten years old. 
Ruiz did not allow the appellant to continue working at the store because the appellant
could not make correct change.

 Deputy Deveesh Amin was a detention officer in the jail where the appellant was held for
nearly two years pending trial. Deputy Amin testified that the appellant had behaved well
in the administrative custody area of the jail. On cross-examination, Deputy Amin also
testified that he had seen a lot of inmates with mental problems or mental illnesses, but
from his experience, the appellant did not exhibit any mental issues. The appellant kept a
neat and orderly cell and did not have any problems with his hygiene.

 Marta Cruz testified that the appellant could read digital clocks, but not analog ones. Cruz
bought the appellant a cell phone and added the line to her plan; the appellant paid for the
additional cost of the line, but she had to enter in his contacts and telephone numbers.
Cruz had a VCR that the appellant was unable to operate. The appellant could not
understand English-language television and liked to watch a particular Spanish-language
children's television show. He lacked certain grooming and hygiene habits such as
cleaning his ears and cutting his fingernails. The appellant purchased a used pick-up truck
for which he paid too much, in Cruz's opinion. The appellant bought clothes and shoes
that were too large for him. In one instance, the appellant wore a plain white blouse
belonging to Cruz and did not realize that it was a woman's blouse. On cross-examination, Cruz testified that she never told defense counsel that the appellant was
mentally retarded. The appellant called her on several occasions when he had been
arrested on DWI or public intoxication charges; he requested that she raise money from
his brother and friends to help him bond out "before Immigration got ahold of him."

 Juan Lizcano Aguirre is one of the appellant's cousins. He testified that the appellant was
very shy as a child. The appellant also did not seem to understand when someone in the
family told a funny story and would occasionally begin laughing when no one else was
laughing. He also testified, however, that the appellant was the only one of his four
brothers who could be depended on to send money home to his family.

 Mario Alvarez was tasked with training the appellant to perform certain road-construction
work for an employer in Houston. He testified that the appellant had trouble placing
cones and using a tape measure and saw, and was the only person that he had ever trained
who was unable to master these skills. The appellant could do a task when it was
explained to him, but he could not retain instructions for more than ten or fifteen minutes. 
Alvarez occasionally interacted with the appellant socially and testified that the appellant
did not always understand jokes and was "almost childish." One of the appellant's
cousins, who worked at the same company, helped the appellant figure out how much
money to send home. On cross-examination, Alvarez testified that the appellant told him
he was leaving Houston for Dallas because he was in love with Marta Cruz. Alvarez and
his supervisor asked him not to go because he was doing a good job. At that time the
appellant made between $360 and $400 per week.

 Jose Luis Uribi was the appellant's supervisor at a landscaping company in Grand Prarie,
Texas. He testified that the appellant would sometimes mow or cut the wrong yard. The
appellant was quick to do a job, but was slow to learn things. It was a joke around the
company that the appellant could not be sent to mow a yard unless the yards were flagged
to indicate which ones to mow. But, he was not slower to learn than other people who
came from Mexico. Uribi also testified that the appellant would laugh at appropriate
times, and that the appellant knew exactly how many hours he had worked each week and
exactly how much he should be paid. 

 Jeffrey Gartrell was a detention officer in the jail where the appellant was held pending
trial. Gartrell testified that the appellant had caused no problems. On cross-examination,
he testified that the appellant maintained his hygiene and an orderly cell. Gartrell had
worked for the sheriff's department for over ten years, and in his experience with
thousands of inmates, he did not believe the appellant was mentally retarded. But,
Gartrell did not know the definition of mental retardation.

 Mariano Valdivia owned a used-car lot and testified that he sold a used pick-up truck to
the appellant and Jose Zarate as co-buyers. Valdivia's records showed that the appellant
made weekly payments of $120 from September 2004 to November 2005. Valdivia
testified that the appellant would make the payments in person and was usually on time
with his weekly payments. Valdivia did not notice anything mentally wrong with the
appellant that would prevent Valdivia from selling him the vehicle.



 As noted above, "adaptive behavior" was defined for the jury as "the effectiveness with
which a person meets standards of personal independence and social responsibility expected of
the person's age and cultural group." (49) The jury could consider relevant evidence presented at
both the guilt or innocence and the punishment phases of trial, and could also focus on evidence
relevant to the factors laid out in Briseno. (50) 

 The evidence relevant to adaptive functioning was extensive, and we need not assign a
weight to each piece of evidence. Some of the more significant evidence showing limitations in
adaptive functioning was the following: (i) the appellant had trouble following instructions and
performing fairly simple tasks in the work environment; (ii) the appellant used limited
vocabulary and did not seem to understand humor; (iii) the appellant could not perform certain
simple personal tasks such as reading an analog clock, following directions to a location, or
operating a VCR; and (iv) the appellant had difficulty learning and socializing. On the other
hand, the following evidence suggested that the appellant did not exhibit limitations in adaptive
functioning: (i) the appellant maintained continuous employment and was recognized by his
employers as a hard and reliable worker; (ii) the appellant made regular payments on a vehicle he
purchased as a co-buyer; (iii) the appellant maintained romantic relationships with at least two
women, neither of whom considered him to be mentally retarded and one of whom considered
him to be "bright"; and (iv) the appellant reliably sent significant amounts of money and other
items to assist his family.

 To prove mental retardation, the appellant had to show by a preponderance of the
evidence that he was not effective in meeting standards of personal independence and social
responsibility expected of his age and cultural group. On review, we must give great deference to
the jury's finding that the appellant was not mentally retarded. Because there was significant
evidence admitted that supported the appellant's effectiveness in meeting standards of personal
independence and social responsibility, we find that the jury's conclusion that the appellant was
not mentally retarded is not so against the great weight and preponderance of the evidence as to
be manifestly unjust. (51) Therefore, we need not consider the third prong, onset before the age of
eighteen. Point of error forty-nine is overruled. 

E. Motion to Open and Close the Argument

 In point of error fifty-two, the appellant argues that the trial court erred in denying his
motion to open and close the arguments at the punishment phase with respect to the issue of
mental retardation. The appellant argues that because he had the burden of proof on the issue of
mental retardation, he should have been permitted to offer a rebuttal after the State's argument.
The appellant would have us apply Rule 269(a) of the Rules of Civil Procedure, which provides
that "the party having the burden of proof on the whole case, or on all matters which are
submitted by the charge, shall be entitled to open and conclude the argument."

 Article 36.07 of the Code of Criminal Procedure governs the order of closing arguments
in criminal trials: "The order of argument may be regulated by the presiding judge; but the
State's counsel shall have the right to make the concluding address to the jury." We dealt with an
argument similar to the appellant's in Martinez v. State, (52) in which the appellant contended that
the civil rules should apply and a defendant should have the right to open and close the argument
when only the issue of insanity is raised, because the defendant bears the burden of proof as to
that affirmative defense. We found no error in denying the appellant's request to open and close
the argument: "Though it may be true that appellant has the burden of proving his affirmative
defense, it is still the State's burden to overcome the defendant's evidence and to prove beyond a
reasonable doubt all the elements of the offense charged, including the intent and culpability of
the defendant." (53)

 More recently in Masterton v. State, we held that Article 36.07 - not the civil rules -
applies to the punishment phase of a capital trial. (54) We stated, "Nothing in the Code of Criminal
Procedure limits the application of Article 36.07 to non-capital cases and we see no reason to do
so." (55) Masterton claimed trial court error in refusing to give him the concluding argument on the
mitigation special issue, but we ultimately found "nothing about the mitigation special issue,
which imposes a burden of proof on neither party, that distinguishes appellant's situation from
our prior holdings." (56) 

 Article 36.07 of the Code of Criminal Procedure continues to apply to the punishment
phase of capital trials. (57) At the punishment phase, the State bears the ultimate burden of proof
required by Article 37.071(c) of the Code of Criminal Procedure to prove future dangerousness
beyond a reasonable doubt. The State's statutory right to make the concluding address to the jury
at punishment reflects that burden. We find no authority for creating an exception from Article
36.07 when the affirmative defense of mental retardation is raised. Point of error fifty-two is
overruled.

IV. ADMISSIBILITY OF WITNESS TESTIMONY

A. Wommack

 In points of error twenty-five through twenty-seven, the appellant argues that the trial
court erred in admitting Officer Mark Wommack's testimony regarding the relative positions of
the appellant and the victim. The appellant argues that the trial court erred for three reasons: (i)
the testimony was speculative; (ii) Officer Wommack was not qualified as an expert witness to
express an opinion concerning the juxtaposition of the appellant and victim; and (iii) the
testimony was more prejudicial than probative.

1. Trial Record

 At trial Officer Wommack testified, without objection, that he is responsible for training
all Dallas police officers who carry the AR-15 rifle. He trained Officer Brian Jackson to use the
AR-15 rifle and recalled that Officer Jackson exceeded standards in his training. He testified that
when standing in a "ready gun position" and observing a threat coming from the side, Officer
Jackson was trained to pivot on the foot nearest the threat and square his shoulders and body
armor to the threat before firing. He testified further that Officer Jackson was trained to continue
firing at a suspect if he was shot by the suspect.

 The appellant first objected when the State asked Officer Wommack to consider a
hypothetical situation with a mannequin representing Officer Jackson. The appellant stated his
objection, "Hypothetical with facts not in evidence." Upon the trial court's request, the State
made the following offer of proof:

 I anticipate with the hypothetical having the mannequin positioned - placed like
we've done with other witnesses in relation to the light that was in here earlier.
And other witnesses indicating where the suspect was found when he was lying in
the yard, the approximate distance. And the other evidence being the photograph
that depicts Officer Jackson's rifle defects in the chair that was on the porch and
the two in the house next door. And I'm going to present a hypothetical to him, if
the officer is struck, as the evidence will show, through the right arm or through-and-through and across the body and with a defect in a chair being here
(indicating), the target being there (indicating), and a couple of defects behind that
target, his opinion, based on his training and experience of whether or not Officer
Jackson was able to get that suspect in sight or what his position would have been
in relation to him being shot based on that training and experience.


After the State's offer, the appellant renewed his objection:

 [W]e don't have any  firm evidence as to where the officer was standing and
how he was standing. And we don't have any evidence at all as to where the
defendant was standing, because only people can testify that that corner was dark,
and by the time they got there many seconds later he was on the ground with his
hands over his head. So there's no evidence where the defendant was when this
event occurred, or how he was standing, or what position he was in. Nor is there
any evidence as to where the officer was standing, or what position he was in at
the time of the shooting. And this is speculation. I'm sure the State would love to
be able to prove this through this witness, but without the facts in evidence, it's an
improper hypothetical.


 The appellant further objected that "[t]here's no predicate under the 705 hearing that that
meets the tests of Daubert or Kelley or anything." The trial court permitted the appellant to
conduct the following voir dire examination:

 [DEFENSE COUNSEL]: What training have you received in crime scene
investigation?


 [WOMMACK]: Actually I was a crime scene investigator through part of the
early years in my deployment time. I didn't do it as a full-time job, but I've had
fingerprints, photo, some reconstruction, but not much.


 [DEFENSE COUNSEL] And when was that?


 [WOMMACK]: It was a long time ago. I hired on in '72, and it was somewhere
around '75.


 


 [DEFENSE COUNSEL]: Fair enough. And what training do you have in crime
scene re-enactment?


 [WOMMACK]: Nothing certified, ma'am.


 [DEFENSE COUNSEL]: Okay. Have you been to the scene of this incident?


 


 [WOMMACK]: No, ma'am.


 [DEFENSE COUNSEL]: Is there anything else that you can give us, like some
study or some kind of proof that this is an accepted method  of determining
where people were standing when an event occurred? Do you have the
documentation for that?

 

 [WOMMACK]: In relationship to how he was shot?


 [DEFENSE COUNSEL]: Uh-huh -- yes, sir. 

 

 [WOMMACK]: Just years of going to calls and studying gun fights.

 The appellant renewed his objection on the basis that Officer Wommack's crime-scene
investigation training was outdated and that he had not been to the scene. The appellant also
objected under Rule 403, arguing that any opinion given by Officer Wommack would have low
probative value that would be outweighed by danger of undue prejudice. Finally, the appellant
objected that the testimony would be "speculation on his part as to what the state of mind of
people were at that point and that evening." 

 After the appellant's objections were overruled, Officer Wommack ultimately testified
that in his opinion, based on Officer Jackson's training, the trajectory of the appellant's bullet,
and the spray of bullets from Officer Jackson's AR-15, Officer Jackson was shot as he faced
away from the appellant and before he had the opportunity to see the appellant, pivot to face him,
and commence firing. 

2. Analysis

 On appeal, the appellant does not present any argument whatsoever with respect to his
points of error on speculation and Rule 403. Rule of Appellate Procedure 38.1(h) requires that
the appellant's brief "must contain a clear and concise argument for the contentions made, with
appropriate citations to authorities and to the record." Points of error twenty-five and twenty-seven are therefore overruled.

 We turn now to point of error twenty-six. While the appellant cited Rule 705 at trial, it
appears from the substance of his objection at trial and his argument on appeal that the appellant
objects to the qualification of Officer Wommack as an expert witness under Rule of Evidence
702. In general, witnesses must testify to matters of which they have personal knowledge. (58) At
common law, witnesses were prohibited from expressing opinions, even when based upon facts
within the witnesses' personal knowledge. (59) Rule 701 relaxed this common law prohibition: "If
the witness is not testifying as an expert, his testimony in the form of opinions or inferences is
limited to those opinions or inferences which are (a) rationally based on the perception of the
witness and (b) helpful to a clear understanding of his testimony or the determination of a fact at
issue." Expert witnesses are permitted wider latitude to offer opinions under Rule 702. (60) "If
scientific, technical, or other specialized knowledge will assist the trier of fact to understand the
evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,
experience, training, or education may testify thereto in the form of an opinion or otherwise." (61) 

 We need not reach Rule 702, however. We may affirm the trial court's ruling if it is
correct on any theory of law applicable to the case and supported by the record. (62) This principle
holds true even when the trial judge gives the wrong reason for his decision, and is especially
true with regard to admission of evidence. (63) Officer Wommack's testimony was admissible as the
opinion of a lay witness under Rule 701. Officer Wommack testified to his personal knowledge
of the training of Officer Jackson, specifically that Officer Jackson was trained to pivot and
square his shoulders to a threat perceived from the side. The State then gave Officer Wommack
the hypothetical assumption that the defendant approached Officer Jackson from the side, and
that the defendant's shot entered Officer Jackson from the side and through his arm and armpit.
Officer Wommack testified that, in his opinion, Officer Jackson did not see the threat, because if
he had seen the threat, he would have pivoted according to his training. 

 Officer Wommack's opinion was rationally based on his perceptions; that is, a reasonable
juror could draw the opinion that Officer Jackson did not see the appellant from the facts of
Officer Jackson's training and the trajectory of the bullet into the side of his body. Furthermore,
the fact at issue was whether the appellant fired before Officer Jackson saw him, and ultimately
whether the appellant acted in self-defense. Officer Wommack's opinion was helpful to the jury
in connecting his testimony about Officer Jackson's training to the determination that the
appellant fired first. The testimony was therefore admissible as a lay opinion under Rule 701.
Point of error twenty-six is overruled.

B. Compton, Wimbish, and Cruz

 In points of error thirty-one through thirty-three, the appellant argues that the trial court
erred in sustaining the State's objection to testimony from Dr. Kristi Compton, Dr. Gary
Wimbish, and Marta Cruz regarding diminished capacity. The appellant argues that because of
mental disease or paranoid delusions, the appellant did not know that he was shooting at a police
officer.

 Texas does not recognize diminished capacity as an affirmative defense. (64) The Texas
Legislature has not enacted any affirmative defenses, other than insanity, based on mental
disease, defect, or abnormality. Thus, they do not exist in Texas. (65) Instead, there is a presumption
under Texas law that a criminal defendant intends the natural consequences of his acts. (66) As with
other elements of an offense, relevant evidence may be presented that a jury may consider to
negate any mens rea elements. (67) This evidence may include evidence of a defendant's history of
mental illness, (68) or evidence of a defendant's physical or mental diseases or defects. (69) But the
evidence still must meet generally applicable requirements for admission of evidence, such as
Rules of Evidence 402 and 403, (70) and may be excluded if it does not truly negate the mens rea. (71) 

 During the trial, the appellant called Dr. Kristi Compton as an expert witness to testify
regarding IQ tests taken by the appellant. During the State's voir dire examination of Dr.
Compton, defense counsel made an offer of proof that the witness would testify that the appellant
had "limited cognitive ability," which was relevant to mens rea:

 [W]e are trying to establish that the defendant is less than normal  in his
understanding and comprehension of events that occur around him. It is an
attempt to rebut evidence of mens rea. The State has put forth evidence that he
intended and knew what he was doing, and I think that his cognitive disabilities
are relevant and should be provided to the jury so that they can  know about
them in making a decision about how his mind worked that night.


The trial court asked, "[A]re you going to offer any direct evidence of examinations that the
defendant in this case did not have  the mens rea?" Defense counsel conceded that there was
no such evidence: "No, Your Honor,  she could not say that. All she can offer is that this man
functions at a low level of cognitive disability [sic]."

 The appellant called Dr. Gary Wimbish to testify about the approximate level of alcohol
in the appellant's blood at the time of the offense. During the State's voir dire examination, Dr.
Wimbish testified that he would give the opinion that the appellant consumed between two and
five drinks on the day of the offense, but that he could not render an opinion about whether the
appellant was intoxicated.

 Marta Cruz's testimony was discussed above. During cross-examination at the guilt
phase, defense counsel asked Cruz if, during the course of her relationship with the appellant, she
helped him "with certain things" or assisted him "in making orders and things at the jail." The
State objected to relevance, and the trial court sustained the objection. When Cruz testified at the
punishment phase, defense counsel said that Cruz's testimony at the punishment phase "is what
we would have put on had we  been allowed to in guilt and innocence." 

 Because the evidence from these witnesses does not negate any mens rea element, the
trial court did not err in excluding the evidence at the guilt or innocence phase. Our analysis in
Ruffin v. State provides a good contrast by illustrating when evidence of mental illness would be
admissible. Ruffin was charged with aggravated assault after shooting at police officers whom he
believed were "trespassers" and "Muslims," but not police officers. We held that the testimony of
a psychologist was relevant and admissible to rebut the mens rea element of the offense; the
psychologist testified that Ruffin suffered from delusions, and that in the psychologist's opinion,
Ruffin was suffering during the offense from psychotic symptoms such as hearing and seeing
things that did not exist. (72) 

 In the present case, the appellant argues that the excluded testimony was relevant to
"whether, because of mental disease or delusion he believed he was not shooting at a uniformed
police officer." He argues further that "when and how paranoid delusions may distort a person's
auditory and visual perceptions is admissible as it relates to whether Appellant intended to shoot
a police officer." But, there is no suggestion in the trial record that the excluded testimony had
anything to do with delusions. Instead, the excluded testimony suggested general limitations in
cognitive ability, intoxication at the time of the offense, and general deficits in adaptive
functioning. The excluded testimony had relevance only to whether the appellant's mental
functioning was below normal to some degree. There was no evidence showing a connection
between the appellant's generally low level of mental functioning and his knowledge during the
commission of the offense that the victim was a police officer. (73) The trial court therefore did not
abuse its discretion in excluding the evidence. (74) Points of error thirty-one through thirty-three are
overruled.

C. Daulat

 In point of error thirty-four, the appellant argues that the trial court erred in sustaining the
State's objection to photographs and accompanying testimony offered to prove that he suffered
broken ribs at or near the time of the arrest, and thereby to impeach police officers who testified
that they did not assault the appellant during his arrest. The appellant argues that he was also
"denied the opportunity to possibly create sympathy for the defendant because he was severely
beaten by officers."

 During the trial, the appellant attempted to show that police officers assaulted him during
his arrest. On cross-examination, several of the testifying officers denied assaulting the appellant.
The appellant then introduced evidence suggesting that the officers had assaulted him, including
testimony from a neighbor and DNA evidence that a bloodstain on the exterior of the neighbor's
house matched the appellant's DNA profile. 

 The appellant also sought to introduce X-ray images and testimony from Dr. Veena
Daulat. Dr. Daulat examined X-rays of the appellant's ribs taken on August 17, 2007. On voir
dire, Dr. Daulat testified that the X-rays showed a "remote left seventh rib fracture." She further
testified that "remote" simply meant that the fracture did not occur on the day of examination or
the day prior: "Remote means it's old. It could be a few days old, it could be a few years old.
[I]t looked old because it didn't have a lucent line to say that it was done today or yesterday." In
fact, the rib fracture could have occurred five, ten, or fifteen years prior to the examination. 

 The State objected that Dr. Daulat's testimony was not relevant because she could only
testify that the appellant had a "remote" rib fracture. The trial court ruled that the evidence was
not admissible: "The Court is  not inclined to let the doctor testify about  an injury that she
knows nothing about and can't pinpoint it. We don't know when the rib was  broken." 

 The trial court did not abuse its discretion in ruling that Dr. Daulat's testimony was not
relevant. There was no evidence connecting the appellant's "remote" rib fracture to the alleged
assault by officers at the time of the appellant's arrest, nearly two years before X-rays were taken.
That the appellant sustained a rib fracture at some time in his life did not tend to make more
probable the theory that the appellant was assaulted by officers on November 14, 2005. (75) Point of
error thirty-four is overruled. 

D. Wilcox

 In point of error thirty-five, the appellant argues that the trial court erred in denying his
objection to the testimony of Officer Robert Wilcox. The entirety of the appellant's point of error
is reproduced below:

 Appellant respectfully directs this Honorable Court's attention to Reporter's
Record Volume 48 pages 123-154 at which the trial court allowed the State to
question Officer Robert Wilcox concerning the initiation of questioning of
Appellant about an extraneous offense of driving while intoxicated. The State
sought to have Officer Wilcox testify about his initial conversation with Appellant
through a translator concerning whether Appellant had any medical or mental
disability that would present him from performing field sobriety tests contrary to
Art. 38.22 C.C.P. and objection to hearsay evidence from the translator.
(RR48:135-137). The Court overruled Appellant's objection. See Miffleton v.
State, 777 S.W.2d 76 (Tex. Crim. App. 1989) for support of issue that no audio
conversation between officer and suspect is admissible. Additionally, the trial
court allowed the State to violate Appellant's fifth amendment of U.S.
Constitution right to remain silent by allowing such testimony. Appellant is
entitled to a new trial based on this constitutional error that denied him a fair trial.


 None of the issues raised in this multifarious point of error is adequately briefed. Rule of
Appellate Procedure 38.1(i) requires a "clear and concise argument for the contentions made,
with appropriate citations to authorities and to the record." To be adequately briefed, a point of
error must cite relevant legal authority and provide legal argument based upon that authority. (76)
The appellant fails to show how Miffleton v. State is relevant to any of his potential claims, (77) and
provides no argument based on that authority. (78) Point of error thirty-five is overruled. 

V. CONTINUANCES

 In point of error twenty-eight, the appellant argues that the trial court erred in denying his
oral motion for continuance in order to obtain the presence of a defense expert. The appellant
acknowledges our clear rule that an oral motion for continuance preserves nothing for review, (79)
but urges us to reconsider because several Texas Courts of Appeals have found an "equitable" or
"due process" exception to this rule. We decline to find such an exception. (80) The record reflects
that the appellant's oral motion for continuance, which was subsequent to several earlier motions
for continuance, was made late in the afternoon of Wednesday, October 31, 2007. The parties
and the trial court had discussed potential scheduling conflicts with this defense expert on the
previous day. There is no question that the appellant had the time to properly present a written,
sworn motion for continuance compliant with the requirements of Articles 29.03, 29.07, and
29.08 of the Code of Criminal Procedure. Point of error twenty-eight is overruled.

 In points of error twenty-nine and forty-six, (81) the appellant argues that a week-and-a-half
recess during the defense presentation of punishment evidence violated his due process rights
under the Fourteenth Amendment of the United States Constitution because it interfered with his
right to present evidence in his favor in an effective and consistent manner. The record reflects
that the trial court excused the jury on the afternoon of Tuesday, October 16, 2007, following an
off-the-record bench conference with the parties. The trial court admonished the jurors not to
deliberate, research, or talk about the case, and concluded, "and those of you going on vacation,
please enjoy it. We are envious." It is not clear from the record why the trial court recessed the
trial, or whether the parties expressly agreed to the recess. But, it is clear that the appellant was
aware of the upcoming recess at least as early as Thursday, October 11, 2007, and did not object
on the record at any time. 

 In the context of a trial-recess point of error, we stated in Johnson v. State, "A trial judge
necessarily has broad discretion to deal with the many unexpected situations which arise during
trial." (82) Our review of the record does not reveal an abuse of the trial court's discretion. Not only
has the appellant failed to show how these points of error are preserved for review, but he has
failed to cite any authority involving recesses found to be an abuse of the trial court's discretion,
or supporting his contention that the trial court's action was error because "[p]rocedural [due]
process provides that the defense  be allowed to put on a continuous and logical presentation
of evidence." Points of error twenty-nine and forty-six are overruled.

VI. MOTION FOR NEW TRIAL

 In point of error forty-seven, the appellant argues that the trial court erred in denying his
request for an evidentiary hearing on his Motion for New Trial. In point of error forty-eight, the
appellant argues that the trial court erred in denying his Motion for New Trial. 

 On November 30, 2007, the appellant filed a Motion for New Trial pursuant to Rule of
Appellate Procedure 21. The motion contained the following grounds for a new trial: (i) the
evidence was legally and factually insufficient to support the jury's verdict on each of the special
issues; (ii) consideration of mental retardation during the punishment phase was unconstitutional;
(iii) the delay in trial during the defense presentation of punishment evidence denied the
appellant a fair trial; (iv) the delays during punishment while the trial court simultaneously
administered another case denied the appellant a fair trial; (v) the requirement that the defense
disclose underlying evidence that would form the basis of expert witness opinions gave the State
an unfair advantage; and (vi) the denial of a continuance to secure the testimony of Dr. Martinez
prejudiced the appellant's defensive strategy. 

 On January 3, 2008, the trial court held a hearing on the Motion for New Trial. Because
the appellant had already been transported to the custody of the Texas Department of Criminal
Justice, the trial court decided not to take live testimony, but rather to consider sworn affidavits
from defense counsel as evidence in support of the motion. The trial court explained that it "[did]
not see any evidence in the affidavits that would require any live testimony, and the Court is of
the opinion the Court can  make a ruling on that motion based solely on the affidavits, which
were incorporated into the record and are evidence." 

 Rule of Appellate Procedure 21.7 provides a trial court with discretion in considering a
motion for new trial: "The court may receive evidence by affidavit or otherwise." A trial court
may rule based on sworn pleadings and affidavits without oral testimony. Live testimony is not
required. (83) A trial court abuses its discretion in failing to hold a hearing only when a defendant
presents a motion for new trial raising matters not determinable from the record. (84) From our
review of the record, we agree with the trial court that the matters raised by the appellant in his
Motion for New Trial could be adequately determined from the record and the affidavits of
defense counsel. Point of error forty-seven is overruled.

 In point of error forty-eight, we review the trial court's denial of the Motion for New Trial
under an abuse-of-discretion standard. (85) We do not substitute our judgment for that of the trial
court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. A trial
court abuses its discretion in denying a motion for new trial only when no reasonable view of the
record could support the trial court's ruling. (86) 

 Each of the matters raised in the Motion for New Trial has been raised again as a point of
error on appeal. Based on our review of the record and the arguments of the parties, we have
affirmed the trial court's ruling on the merits of each matter with the exception of the sixth, the
denial of a continuance to secure the testimony of Dr. Martinez. With respect to this matter, a
reasonable view of the record supports the trial court's reasoning that the testimony of Dr.
Martinez would have been substantially similar to the two other mental-retardation experts that
were introduced by the appellant, and Dr. Martinez had been available to testify at other times
during the defense presentation of evidence. We therefore find that the trial court's decision was
not arbitrary or unreasonable, and the trial court did not abuse its discretion in denying the
appellant's Motion for New Trial. Point of error forty-eight is overruled. 

VII. JURY CHARGE 

A. Guilt Phase

 In points of error thirty-six through thirty-eight, the appellant argues that the trial court
erred in denying his requests for jury charges on the lesser-included offenses of manslaughter and
negligent homicide, and the justification of self-defense. 

1. Manslaughter and Negligent Homicide

 The appellant argues that a charge on manslaughter was warranted because the appellant
was highly intoxicated and acting recklessly, and "[t]he events that occurred when the Defendant
 encountered Officer Jackson  happened very fast." In addition, the appellant "submits that
he felt in his mind that he was being confronted by an armed person when he recklessly pointed
the gun toward the deceased and fired once." The appellant argues that a charge on negligent
homicide was warranted because "Appellant acted negligently and should have been aware of a
substantial and unjustified risk that the circumstances exist or the result would occur when he
fired his gun once upon the excited, highly emotional encounter where the police were chasing
him."

 We use a two-step test to determine whether an appellant was entitled to a jury charge on
a lesser-included offense. (87) First, we determine if the offense requested was a lesser-included
offense of the offense charged. Article 37.09 of the Code of Criminal Procedure defines a lesser-included offense:

 An offense is a lesser included offense if:


 (1) it is established by commission of the same or less than all the facts required to
establish the commission of the offense charged; (88)


 (2) it differs from the offense charged only in the respect that a less serious injury
or risk of injury to the same person, property, or public interest suffices to
establish its commission;


 (3) it differs from the offense charged only in the respect that a less culpable
mental state suffices to establish its commission; or


 (4) it consists of an attempt to commit the offense charged or an otherwise
included offense.


Second, we determine if there is some evidence in the record that would permit a jury rationally
to find that if the appellant is guilty, he is guilty only of the lesser-included offense. (89) We
consider the evidence produced by both parties, but the credibility of the evidence and whether it
conflicts with, or is controverted by, other evidence is not considered. (90)

 The indictment alleged the offense of capital murder with the following elements:

 (i) the appellant;


 (ii) intentionally and knowingly;


 (iii) caused the death of Brian Jackson, an individual, by shooting him with a firearm; and


 (iv) Brian Jackson was a City of Dallas police officer acting in lawful discharge of an
official duty; and

 

 (v) the appellant knew that Brian Jackson was a police officer.


The offense of manslaughter is defined in Section 19.04 of the Penal Code: "A person commits
an offense if he recklessly causes the death of an individual." The offense of negligent homicide
is defined in Section 19.05: "A person commits an offense if he causes the death of an individual
by criminal negligence." Because manslaughter and negligent homicide could have been
established by commission of the same or less than all the facts required to establish the offense
of capital murder as alleged in the indictment, manslaughter and negligent homicide are lesser-included offenses. 

 While he meets the first prong, the appellant does not meet the second prong of the test
because there was no evidence that he negligently or recklessly, but not intentionally or
knowingly, caused the death of Officer Jackson. Whatever the appellant now "submits that he
felt in his mind," evidence of his internal thoughts was not presented to the jury at the trial.
Furthermore, because voluntary intoxication does not constitute a defense to the commission of a
crime, (91) the appellant's evidence of voluntary intoxication would not permit a rational jury to
find that the appellant was guilty of manslaughter or negligent homicide, but was not guilty of
capital murder. Finally, there is no evidence in the record that the appellant came upon Officer
Jackson too suddenly to be able to form an intentional or knowing mental state with respect to
his conduct in shooting the officer. Points of error thirty-six and thirty-seven are overruled. 

2. Self-Defense

 In point of error thirty-eight, the appellant argues that the trial court erred in denying his
request for a jury charge on self-defense. He argues that in his "intoxicated and paranoid state of
mind at the time of the offense, he was acting in self defense." Further, he argues that there is no
evidence that Officer Jackson identified himself as a police officer or ordered the appellant to
throw down his weapon. On the other hand, there was evidence that he surrendered after Officer
Jackson fell, and the arresting officers beat the appellant after his arrest. 

 The issue of self-defense is not submitted to the jury unless evidence is admitted
supporting the defense. (92) In Shaw v. State, we stated that a defense is supported by the evidence if
"there is some evidence, from any source, on each element of the defense that, if believed by the
jury, would support a rational inference that that element is true." (93) If a defense is so supported,
"the defendant is entitled to an instruction on that defense, even if the evidence supporting the
defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is
not credible." (94) Whether a defense is supported by the evidence is a sufficiency question
reviewable on appeal as a question of law. (95)

 Section 9.31(a) of the Penal Code establishes the elements of self-defense. "Except as
provided in Subsection (b), a person is justified in using force against another when and to the
degree the actor reasonably believes the force is immediately necessary to protect the actor
against the other's use or attempted use of unlawful force." (96) Subsection (b) then establishes
certain exceptions, including that "the use of force against another is not justified  to resist an
arrest or search that the actor knows is being made by a peace officer  even though the arrest or
search is unlawful, unless the resistance is justified under Subsection (c)." Subsection (c)
provides:

 The use of force to resist an arrest or search is justified (1) if, before the actor
offers any resistance, the peace officer  uses or attempts to use greater force
than necessary to make the arrest or search; and (2) when and to the degree the
actor reasonably believes the force is immediately necessary to protect himself
against the peace officer's  use or attempted use of greater force than
necessary. (97)

 

 Here, it is undisputed that the appellant fired several shots at police officers as they
searched for him behind Cruz's house. As the appellant ran around to the front of the house, the
appellant fired one shot and Officer Jackson fired three shots. The evidence presented at trial was
consistent with the appellant's revolver firing first, followed by Officer Jackson's rifle firing
second. 

 The appellant failed to introduce evidence supporting each of the elements of self-defense. The appellant has failed to introduce evidence that, before the appellant offered any
resistance, Officer Jackson used or attempted to use greater force than necessary to make the
arrest. Furthermore, the appellant has failed to introduce evidence that the appellant reasonably
believed that force was immediately necessary to protect himself when no officer had returned
the appellant's fire until after he shot Officer Jackson. Because the appellant did not submit
evidence to support a rational jury finding on each element of self-defense, the trial court did not
err in denying the requested jury charge. (98) Point of error thirty-eight is overruled. 

VIII. PUNISHMENT PHASE

A. Victim-Impact Testimony

 In points of error forty-one through forty-five, the appellant argues that the trial court
erred in overruling his objections to the testimony of several State witnesses as improper victim-impact testimony. In Mosley v. State, (99) we established that victim-impact and victim-character
evidence are admissible at the punishment phase of trial with certain limitations: 

 Both victim impact and victim character evidence are admissible, in the context of
the mitigation special issue, to show the uniqueness of the victim, the harm caused
by the defendant, and as rebuttal to the defendant's mitigating evidence. Rule 403
limits the admissibility of such evidence when the evidence predominantly
encourages comparisons based upon the greater or lesser worth or morality of the
victim. (100)


1. Foster

 In point of error forty-one, the appellant argues that the trial court erred in admitting
testimony of Officer Anthony Wayne Foster. (101) Officer Foster testified that he came into contact
with the appellant approximately two months before the instant offense. Officer Foster was
waiting in the "book-in line" at the Dallas County Jail with an individual whom Officer Foster
had just arrested; Officer Robert Wilcox was waiting in the line with the appellant, whom he had
just arrested for DWI. The appellant was screaming profanities and threatening to kill Officer
Wilcox. Officer Wilcox asked Officer Foster if he should file a retaliation charge against the
appellant, but Officer Foster recommended against filing the charge. A few days after Officer
Foster learned of the death of Officer Jackson, he learned that the appellant had been arrested for
the crime.

 The State asked Officer Foster, "Now, Officer, do you wish now to this day you would've
filed a retal-." The State's question was interrupted by a relevance objection from the appellant.
The trial court sustained the objection. On cross-examination, the appellant nonetheless asked the
officer about the retaliation charge: 

 [DEFENSE COUNSEL]: Okay. And, of course, no retaliation case was filed, was
there?


 [FOSTER]: No.


 [DEFENSE COUNSEL]: You talked about it and didn't take it serious and didn't
file it. 


On redirect, the State again asked Officer Foster about the retaliation charge:

 [STATE]: Officer, you wish you'd filed that charge?

 

 [DEFENSE COUNSEL]: Again, Your Honor, I object. It's irrelevant.

 

 THE COURT: Overruled. I think it was a close call before, and I think the door's
been opened by  your line of questioning. You can answer  the question.

 

 [FOSTER]: Yes, I do. I'm going to think about it for the rest of my career.


 [DEFENSE COUNSEL]: Your Honor, I object. That's victim impact statement
right there.

 

 THE COURT: Overruled.

 

 The appellant simply characterizes Officer Foster's response - "I'm going to think about
it for the rest of my career" - as victim-impact evidence, without any further discussion. (102) Even
assuming such characterization is proper, the appellant himself "opened the door" to the
testimony. In addition, the appellant has failed to explain why such victim-impact evidence
would be inadmissible. As we said in Mosely, victim-impact evidence is admissible so long as it
complies with the rules of evidence and does not encourage comparisons based on the greater or
lesser worth of the victim. The appellant fails to explain how Officer Foster's testimony
regarding the effect of Officer Jackson's death violates the limitations of Mosely or the rules of
evidence. Point of error forty-one is overruled. 

2. Jackson, Irizarry, Kramer, and Huerta

 In points of error forty-two through forty-five, the appellant argues that the trial court
erred in overruling his objection to the testimony of four State witnesses (Jackson, Irizarry,
Kramer, and Huerta, respectively) as victim-impact testimony with a prejudicial effect that
outweighed any probative value. The appellant argues that their testimony "makes a comparative
worth analysis of the value of the victim to their families and the community compared to the
defendant or other members of society." But the appellant failed to preserve any error for review.

 For the alleged errors to be preserved for our review, Rule of Appellate Procedure 33.1
requires that the record must show that the appellant made a timely, specific objection to the trial
court, and the trial court ruled on the objection, or refused to rule on the objection, and that the
appellant objected to the refusal. (103) Before the witnesses were called, the appellant stated that he
"anticipate[d] that the next witnesses will be giving victim impact testimony." He objected under
the Eighth Amendment, arguing that "there is a danger that the admission of this  victim
impact statement creates a constitutionally uncontestable risk that the jury might impose the
death penalty in an arbitrary and capricious manner," and also objected under Rules of Evidence
401, 402, and 403. The trial court overruled the constitutional objection, citing Mosely. The trial
court refused to make a finding with respect to the evidentiary objection, reasoning, "I can't
balance anything until I've heard it."

 Gina Jackson was the first of the four witnesses to testify. Ms. Jackson is the victim's
older sister. She described hearing the news of her brother's death, traveling to Dallas, and
meeting her brother's friends upon her arrival. She further described the memorial services, the
close relationship she had with her brother, and the negative impact that her brother's death
continued to have on her life. At the conclusion of her testimony, the State asked the following
question: "Ms. Jackson, if you would, tell the jury, again, through your eyes as Brian's sister the
type of person, the character you saw when you think of your younger brother. Just help them
understand a little bit about the character." The appellant objected and asked the trial court "to do
a 401, 402, and 403 analysis to this type of evidence." The trial court overruled the objection, but
the State withdrew the question and called its next witness.

 After Ms. Jackson's testimony, Officer Melquiades Irizarry testified that she arrested the
appellant for public intoxication on June 6, 2004. Officer Brandi Kramer then testified that she
encountered the appellant in an intoxicated state on December 25, 2004, and that she would have
arrested him for public intoxication, but a relative appeared at the scene and took responsibility
for him. Finally, David Huerta, a neighbor of Marta Cruz, testified about a "scuffle" at Cruz's
house in September 2005. The appellant made no objections during the testimony of these three
witnesses. 

 The appellant's preliminary objection that unidentified "next witnesses" would be
presenting victim-impact testimony was not sufficiently specific to preserve error for review. In
addition, the trial court never ruled on the objection that the testimony was inadmissible under
Rules 402 and 403, and the appellant failed to object to its refusal to rule. We also note that only
Gina Jackson actually gave victim-impact testimony. Her testimony was not only well within the
limitations established by Mosely, but the State withdrew the only question specifically objected
to by the appellant. Points of error forty-two through forty-five are overruled. 

B. Review of Future Dangerousness

 Pursuant to Article 37.071 of the Code of Criminal Procedure, the trial court submitted a
future-dangerousness special issue to the jury at the conclusion of the punishment phase. In point
of error fifty-three, the appellant argues that the evidence was legally insufficient to support the
jury's affirmative answer because (i) the appellant had no prior violent background, (ii) defense
experts testified that the appellant was a low risk for future dangerousness, but the State did not
introduce expert testimony in rebuttal, and (iii) there was no evidence of premeditation.

 Article 44.251 of the Code of Criminal Procedure requires this Court to reform a sentence
of death to a sentence of confinement for life without parole if we find that there is legally
insufficient evidence to support the jury's affirmative answer. In reviewing a legal insufficiency
claim, we view the evidence in the light most favorable to the jury's finding and then determine
whether any rational trier of fact could have found beyond a reasonable doubt that there is a
probability that the appellant would commit criminal acts of violence that would constitute a
continuing threat to society. (104) In other words, if a rational juror necessarily would have
entertained a reasonable doubt as to the probability of appellant's dangerousness, we must reform
the trial court's judgment to reflect a sentence of life imprisonment. (105) 

 During the punishment phase of trial, the State attempted to prove the probability of the
appellant's future dangerousness by introducing evidence of his criminal record and his
propensity for violence against police officers. Lieutenant Richard Rivas, Sergeant Francis Scott
Crump, and Officer Raymond McClain testified that the appellant fired at them in the alley
behind Marta Cruz's house. Officer Robert Wilcox arrested the appellant for driving while
intoxicated in September 2005, and several witnesses testified that the appellant was
uncooperative, screamed profanities, and threatened to kill Officer Wilcox when the appellant
got out of jail. Officer Melquiades Irizarry testified that she arrested the appellant for public
intoxication on June 6, 2004. Officer Brandi Kramer testified that she encountered the appellant
in an intoxicated state on December 25, 2004, and that she would have arrested him for public
intoxication, but a relative appeared at the scene and took responsibility for him. David Huerta
testified that he heard a "scuffle" at Cruz's house in September 2005; when he approached Cruz
and the appellant and informed them that he intended to call the police, the appellant told him
"You call the damn police. I'll take them down, too, with me."

 The appellant called Marta Cruz to provide evidence with respect to the mental-retardation and mitigation special issues. However, evidence demonstrating future dangerousness
emerged on both direct and cross-examination. Cruz testified that on September 11, 2005, the
appellant was angry that she was not answering her cell phone and left several voice messages
threatening to "fuck [her] up." He waited for her to arrive home, and when she got home he
pulled a steak knife from the kitchen and forced her to go into the bedroom. When she threatened
to call the police, the appellant grabbed her phone and dialed 911 himself before hanging up.
When the police responded to the call, an officer noticed that Cruz had bruises on her leg and
arm. She told the officer that during an argument approximately a week earlier, the appellant had
pushed her into an exercise machine. Cruz further testified that the appellant had told her that
after breaking up with a previous girlfriend and then seeing her with other men at a club, he
retrieved a knife from his car but could not find the ex-girlfriend afterwards.

 The defense evidence rebutting future dangerousness included a number of family
members, friends, and co-workers who testified about the appellant's good character. Several
witnesses, including Cruz, suggested that the appellant was violent only when he had been
drinking. In addition, detention officers in the jail where the appellant was held for nearly two
years testified that the appellant had behaved well. 

 The defense also introduced expert witnesses, Dr. Jonathan Sorensen and Dr. Mark
Vigen. Dr. Sorensen, an expert on risk assessment and future dangerousness, testified that he
performed an actuarial study to determine the likelihood that the appellant would commit acts of
violence while incarcerated. Relying on certain characteristics of the appellant and data on
disciplinary infractions from the Texas Department of Criminal Justice, Dr. Sorensen testified
that the appellant's likelihood of committing a violent act over a lifetime of incarceration was 8.1
percent, while the overall base rate is 16.4 percent. Dr. Vigen, a psychologist in private practice,
testified that the prisons run by the Texas Department of Criminal Justice are well-run prisons.
The corrections officers are well-trained and are able to effectively control the inmates, resulting
in low rates of violence within the prison system. He further opined that "the likelihood that [the
appellant] will continue to commit violent behavior which would be a threat to the prison society
is very low." 

 Viewing all of the evidence in the light most favorable to the jury's finding, a rational
trier of fact could have found beyond a reasonable doubt that there is a probability that the
appellant would commit criminal acts of violence that would constitute a continuing threat to
society. The State presented evidence that the appellant had a history of violence toward
girlfriends, including multiple threats and assaults against Cruz and an attempt to assault a
previous girlfriend. The appellant also had a criminal history of DWI and public intoxication.
Perhaps most importantly, the appellant made several statements indicating his willingness to kill
police officers, directly threatened to kill a police officer during a DWI arrest, committed
aggravated assault by shooting at multiple police officers on the night of the offense, and
ultimately shot and killed Officer Jackson. The appellant's propensity for threats and violence
against police officers could prove to a reasonable juror that the appellant would be particularly
likely to commit criminal acts of violence within prison society, where the appellant would be in
frequent contact with prison personnel. (106) Point of error fifty-three is overruled.C. Review of Mitigation

 In point of error thirty-nine, the appellant acknowledges in his brief that this Court "does
not review the sufficiency of the evidence to support a jury's negative answer to the mitigation
special issue," but argues that "the failure to do so violates his constitutional and statutory rights
and renders the statute unconstitutional." In point of error forty, the appellant argues that the
jury's verdict on the mitigation special issue is against the great weight and preponderance of the
evidence.

 In McFarland v. State, (107) we held that appellate review of the jury's answer to the
mitigation special issue is not constitutionally required: "So long as the jury is not precluded
from hearing and effectuating mitigating evidence, we have never regarded appellate review of
mitigating evidence to be an essential component of a constitutionally acceptable capital
punishment scheme." (108) We decline to overrule this clear precedent. Points of error thirty-nine
and forty are overruled.

IX. PREVIOUSLY DECIDED POINTS OF ERROR

 In points of error fifty-four through seventy-nine, the appellant copies twenty-six points
of error originally presented in the Amended Brief for Appellant in Saldano v. State. (109) The
Saldano points of error are, respectively, 19, 25, 28, 30, 38-41, 44-46, 51-62, and 64-66; these
points of error have been altered only by deleting some of the argument contained within them
and adding a few non-substantive changes. (110) Points of error fifty-four through sixty-four in the
present case challenge the constitutionality of the jury charge at the punishment phase, while
points of error sixty-five through seventy-nine challenge the constitutionality of Texas death
penalty procedure. In his brief, the appellant concedes, as did the appellant in Saldano, (111) that the
latter points of error "have been previously submitted to this Honorable Court; which previously
has turned them down."

 The appellant does not present any facts that distinguish the present case from Saldano,
nor does he present any new legal authority suggesting that we should reconsider our disposition
of these issues. Therefore, as in Saldano, we believe it sufficient to dispose of points of error
fifty-four through sixty-four "by recognizing that the trial court submitted a charge consistent
with applicable state statutes, which have withstood numerous constitutional challenges." (112)
Further, we will "decline appellant's invitation to review our prior decisions" (113) on the issues
raised in points of error sixty-five through seventy-nine. Points of error fifty-four through
seventy-nine are overruled.

 We affirm the judgment of the trial court. 


Delivered: May 5, 2010.

Do not publish. 
1. See Code Crim. Proc. art 37.071, § 2(h) ("The judgment of conviction and sentence of death shall be
subject to automatic review by the Court of Criminal Appeals.").
2. 476 U.S. 79 (1986).
3. Id., at 89.
4. 514 U.S. 765 (1995).
5. Id., at 767; see also Watkins v. State, 245 S.W.3d 444, 447 (Tex. Cr. App. 2008), cert. denied, 129 S. Ct.
22 (2008) (quoting Purkett).
6. Watkins, 245 S.W.3d, at 447.
7. Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008); see also Gibson v. State, 144 S.W.3d 530, 533-34
(Tex. Cr. App. 2004).
8. Snyder, 128 S. Ct., at 1208 (citing Hernandez v. New York, 500 U.S. 352 (1991)).
9. See, e.g., Watkins, 245 S.W.3d, at 448-49; Keeton v. State, 749 S.W.2d 861, 868 (Tex. Cr. App. 1988).
10. We will use the racial classifications that appear to be most commonly used by the parties at the
Batson hearing. We note, however, that the terms "African-American" and "black" were used interchangeably, and
the venire member of the "other" race was specifically recognized on occasion as Indian.
11. During the Batson hearing, the parties included the alternate juror and strikes in the analysis.
12. See Miller-El v. Dretke, 545 U.S. 231, 240-41 (2005).
13. Watkins, 245 S.W.3d at 451.
14. We could compare the number of black venire members struck by the State to the total number of black
venire members (75%), and then compare that percentage to the percentage of white venire members struck by the
State from the total number of white venire members (22%). Miller-El v. Cockrell, 537 U.S. 322, 331 (2003). We
could compare the number of black venire members struck by the State to the total number of black venire members
(75%), and then compare that percentage with the percentage of non-black venire members struck by the State from
the total number of non-black venire members (26%). Id. In light of the multiple racial classification involved,
perhaps we should instead compare the number of black venire members struck by the State to the total number of
black venire members (75%), and then compare that percentage with the percentages of each racial classification of
non-black venire members struck by the State from the totals within the venire (22% white, 33% Hispanic, 100%
other). We could also compare the percentage of its allotted peremptory challenges that the State exercised on black
venire members (6 divided by 16, or 37.5%) to the percentage of black venire members within the total venire (8
divided by 47, or 17%). Watkins, 245 S.W.3d, at 451. Finally, we could compare the percentage of its allotted
peremptory challenges that the State exercised on black venire members (37.5%) to the percentage of black venire
members struck by the State from the total number of black venire members (75%). Miller-El v. Cockrell, 537 U.S.,
at 342 (finding 10 of 14 strikes used to remove 91% of eligible African-American venire members "raise[d] some
debate as to whether the prosecution acted with a race-based reason when striking prospective jurors").
15. Each of these techniques presents its own analytical difficulties, particularly because (i) the analysis
becomes less meaningful as the number of identified racial classifications grows larger and the number of individuals
within each classification shrinks, (ii) the appellant's peremptory challenges can dramatically affect the statistics, and
(iii) the relevance of the numbers produced by several techniques is not clear.
16. Reed v. Quarterman, 555 F.3d 364, 376 (5th Cir. 2009).
17. Jasper v. State, 61 S.W.3d 413, 422 (Tex. Cr. App. 2001). In particular, we have previously denied a
Batson claim where the State's reason for using a peremptory challenge was that a venire member circled this precise
answer. In Camacho v. State, 864 S.W.2d 524, 529 (Tex. Cr. App. 1996), we held that the appellant did not satisfy
his burden of persuasion in a comparative juror analysis where all venire members who circled a "bad" response to
this question, including non-black venire members, were struck by the State.
18. 43 S.W.3d 1, 5-6 (Tex. Cr. App. 2001) (emphasis added) (citing Wolfe v. State, 147 Tex. Crim. 62, 178
S.W.2d 274 (1944) (op. on reh'g)).
19. Cf. Saldano v. State, 232 S.W.3d 77, 92 (Tex. Cr. App. 2007) (analyzing denial of challenges for cause
on the merits where appellant demonstrated harm by identifying a specific individual as an objectionable juror).
20. Colburn v. State, 966 S.W.2d 511, 517 (Tex. Cr. App. 1998); see also Tex. Code Crim. Proc. art
35.16(b).
21. Colburn, 966 S.W.2d, at 517; see also Witherspoon v. Illinois, 391 U.S. 510, 522 (1968) ("[A] sentence
of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for
cause simply because they voiced general objections to the death penalty or expressed conscientious or religious
scruples against its infliction.").
22. Smith v. State, 297 S.W.3d 260, 268 (Tex. Cr. App. 2009).
23. Colburn, 966 S.W.2d, at 517.
24. Id.
25. See, e.g., Blue v. State, 125 S.W.3d 491, 499 (Tex. Cr. App. 2003) (finding that trial court did not abuse
its discretion by granting State's challenge for cause where juror gave conflicting answers about her ability to follow
the law).
26. 982 S.W.2d 386 (Tex. Cr. App. 1998).
27. See, e.g., Lagrone v. State, 942 S.W.2d 602, 612 (Tex. Cr. App. 1997) (declining to address state
constitutional error where appellant "failed to provide us with any distinction or reason that the Texas Constitution
provides greater protection than the Fifth Amendment").
28. 942 S.W.2d, at 612. In Lagrone, we first discussed our holding in Soria v. State, 933 S.W.2d 46 (Tex.
Cr. App. 1996), that testimony by an expert witness could be interpreted as a waiver of Fifth Amendment
protections: "[O]ur decision in Soria stands for the proposition that once a defendant has executed a limited waiver
of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future
dangerousness, the trial court may order that defendant to submit to a state-sponsored future dangerousness
examination." We then extended Soria "to allow trial courts to order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, or plans to introduce, its own
future dangerousness expert testimony."
29. 998 S.W.2d 230 (Tex. Cr. App. 1999).
30. Id., at 234.
31. 942 S.W.2d, at 611.
32. While unpublished opinions cannot be cited by parties as legal authority, our unpublished opinion in
Ward v. State, No. AP 74695, 2007 WL 1492080 (Tex. Cr. App. May 23, 2007), provides an example of how
Lagrone was applied with respect to mitigation issues. 
33. To support his argument on appeal, the appellant simply cites to Sanchez v. State, 707 S.W.2d 575 (Tex.
Cr. App. 1980), without explaining how it applies. In Sanchez, we held that pursuant to Article I, Section 10 of the
Texas Constitution, when a defendant is arrested, he has the right to remain silent and the right not to have that
silence used against him, even for impeachment purposes, regardless of when he is advised of those rights.
34. Tex. R. App. P. 38.1(i) (The appellant's brief "must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and to the record.").
35. 536 U.S. 304, 317 (2002).
36. See, e.g., Neal v. State, 256 S.W.3d 264, 272 (Tex. Cr. App. 2008), cert. denied, 129 S. Ct. 1037 (2009);
Williams v. State, 270 S.W.3d 112, 132 (Tex. Cr. App. 2008) ("A defendant, asserting a mental retardation claim in
a death penalty case, is entitled to the process of a 'full and fair hearing' to establish this claim.") (quoting Hall v.
Quarterman, 534 F.3d 365, 371 (5th Cir. 2008)).
37. 256 S.W.3d, at 272.
38. Sapata v. State, 574 S.W.2d 770, 771 (Tex. Cr. App. 1978).
39. R. App. P. 33.1(a).
40. To support this assertion, the appellant encourages us to draw an analogy to Alexander v. Turtur &
Associates, 146 S.W.3d 113 (Tex. 2004). In Alexander, the Texas Supreme Court concluded that expert testimony
was necessary, under the complex facts of that case, for the plaintiffs to prove the proximate-cause element of a legal
malpractice claim. Id., at 120. We find the discussion of the plaintiffs' burden to prove legal malpractice in
Alexander to have little relevance to the State's rebuttal of mental-retardation evidence in the present case. 
41. 239 S.W.3d 757, 770 (Tex. Cr. App. 2007).
42. 135 S.W.3d 1, 9 (Tex. Cr. App. 2004).
43. Gallo, 239 S.W.3d, at 770.
44. Briseno, 135 S.W.3d, at 7-8; see also Neal, 256 S.W.2d, at 272-73; Gallo, 239 S.W.3d, at 769. Because
the adaptive functioning criteria can be "exceedingly subjective," in Briseno we also identified several other
evidentiary factors which factfinders might also focus upon in weighing evidence of mental retardation:



 Did those who knew the person best during the developmental stage - his family, friends, teachers,
employers, authorities - think he was mentally retarded at that time, and, if so, act in accordance with that
determination?

 Has the person formulated plans and carried them through or is his conduct impulsive?

 Does his conduct show leadership or does it show that he is led around by others?

 Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially
acceptable?

 Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander
from subject to subject?

 Can the person hide facts or lie effectively in his own or others' interests?

 Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that
offense require forethought, planning, and complex execution of purpose?


45. Gallo, 239 S.W.3d, at 770.
46. There appear to be arithmetical errors in this testimony. They do not affect our decision.
47. See, e.g., Maldanado v. Thaler, No. H-07-2984, 2009 WL 3074330 (N.D.Tex. September 24, 2009)
(describing expert disagreement about whether a defendant's "cultural differences" artificially lowered his IQ
scores). 
48. Briseno, 135 S.W.3d, at 7 n.25. The trial court also used the Health and Safety Code definition in its
punishment charge to the jury in the present case.
49. Tex. Health & Safety Code § 591.003(1).
50. 135 S.W.3d, at 8-9.
51. See, e.g., Gallo, 239 S.W.3d at 774 (where evidence was both in favor of and against a finding of mental
retardation, "the jury was ultimately in the best position to make credibility determinations and evaluate this
conflicting evidence"). 
52. 501 S.W.2d 130 (Tex. Cr. App. 1973).
53. Id., at 132.
54. 155 S.W.3d 167, 175 (Tex. Cr. App. 2005).
55. Id.
56. Id.
57. See, e.g., Luna v. State, 268 S.W.3d 594, 608 (Tex. Cr. App. 2008), cert. denied 130 S. Ct. 72 (2009). 
58. Tex. R. Evid. 602.
59. 2 Steven Goode et al., Texas Practice: Guide to the Texas Rules of Evidence § 701.2 .
60. See id., at § 702.2.
61. R. Evid. 702.
62. Romero v. State, 800 S.W.2d 539, 543 (Tex. Cr. App. 1990).
63. Id.
64. Jackson v. State, 160 S.W.3d 568, 573 (Tex. Cr. App. 2005).
65. Ruffin v. State, 270 S.W.3d 586, 593 (Tex. Cr. App. 2008).
66. Id., at 591 (citing Ex parte Thompson, 179 S.W.3d 549, 556 n.18 (Tex. Cr. App. 2005)).
67. Jackson, 160 S.W.3d, at 574.
68. Id.
69. Ruffin, 270 S.W.3d, at 593.
70. See Jackson, 160 S.W.3d, at 574; Ruffin, 270 S.W.3d, at 595-96. Rule 402 provides that evidence which
is not relevant is inadmissible. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the
existence of any fact that is of consequence to the determination of the action more probable or less probable than it
would be without the evidence." Rule 403 states, "Although relevant, evidence may be excluded if its probative
value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or
by considerations of undue delay, or needless presentation of cumulative evidence."
71. Ruffin, 270 S.W.3d, at 596.
72. Id., at 590.
73. See United States v. Cameron, 907 F.2d 1051, 1067-68 (11th Cir. 1990) (psychiatric evidence to negate
specific intent is admissible when it focuses on the appellant's specific state of mind at the time of the offense, but
the appellant failed to demonstrate how her psychiatric evidence of schizophrenia would negate intent to distribute
crack cocaine); Ruffin, 270 S.W.3d at 596 n.32 (citing Cameron). 
74. While the trial court ruled that the testimony of Dr. Wimbish was not admissible under Rule 403, we note
that the testimony was likely also inadmissible under Section 8.04(a) of the Penal Code, which provides, "Voluntary
intoxication does not constitute a defense to the commission of a crime." See Sakil v. State, 287 S.W.3d 23, 28 (Tex.
Cr. App. 2009) ("Evidence of an appellant's intoxication, if any, does not negate the elements of intent or
knowledge.") (quoting Hawkins v. State, 605 S.W.2d 586, 589 (Tex. Cr. App. 1980)).
75. Tex. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of
any fact that is of consequence to the determination of the action more probable or less probable than it would be
without the evidence.").
76. See Busby v. State, 253 S.W.3d 661, 673 (Tex. Cr. App. 2008), cert. denied 129 S. Ct. 625 (2008) ("This
Court has no obligation to construct and compose appellant's issues, facts, and arguments with appropriate citations
to authorities and to the record.") (internal quotations omitted); George E. Dix & Robert O. Dawson, 43 Texas
Practice: Criminal Practice and Procedure § 43.404 ("A point of error may be disregarded or overruled or
dismissed as inadequately briefed if it is supported by neither citation to authority nor argument in the brief."). 
77. 777 S.W.2d 76, 81 (Tex. Cr. App. 1989) (audio portion of a tape should have been suppressed at trial to
the extent that it contained compelled testimony given in response to custodial interrogation).
78. See, e.g., Rhoades v. State, 934 S.W.2d 113, 119 (Tex. Cr. App. 1996) (point of error was inadequately
briefed where appellant "simply declares that his right to counsel was violated, and presents no argument or authority
for this contention"); Cardenas v. State, 30 S.W.3d 384, 393 (Tex. Cr. App. 2000) (point of error was inadequately
briefed where appellant failed to explain how cited authorities supported appellant's argument).
79. Dewberry v. State, 4 S.W.3d 735, 755 (Tex. Cr. App. 1999); Anderson v. State, No. PD 1441-08, 2009
WL 3837335, *3 (Tex. Cr. App. November 18, 2009).
80. Anderson, at *3.
81. While phrased in a slightly different manner, points of error twenty-nine and forty-six appear to contain
identical claims. Point of error forty-six also mentions the Equal Protection Clause of the United States Constitution,
but presents no argument for how it may apply.
82. Johnson v. State, 583 S.W.2d 399, 405 (Tex. Cr. App. 1979) (citing Sapata, 574 S.W.2d, at 771 (Tex.
Cr. App. 1978) ("The trial court is necessarily vested with broad discretion to conduct a trial.")).
83. Holden v. State, 201 S.W.3d 761, 763 (Tex. Cr. App. 2006).
84. Id.
85. Id. 
86. Id.
87. Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Cr. App. 1993).
88. To determine whether a lesser included offense is "established by commission of the same or less than all
the facts required to establish the commission of the offense charged," we must compare the elements of the offense
as alleged in the indictment with the elements of the potential lesser included offense. Hall v. State, 225 S.W.3d 524,
535-36 (Tex. Cr. App. 2007).
89. Rousseau, 855 S.W.2d at 673; Royster v. State, 622 S.W.2d 442 (Tex. Cr. App. 1981). 
90. Smith, 297 S.W.3d at 274-75; Banda v. State, 890 S.W.2d 42, 60 (Tex. Cr. App. 1994). 
91. Tex. Pen. Code § 8.04(a). 
92. Id., at § 2.03(c).
93. 243 S.W.3d 647, 657 (Tex. Cr. App. 2007).
94. Id., at 658. 
95. Id.
96. Tex. Pen. Code § 9.31(a).
97. Additional elements must be met to use the justification of Deadly Force in Defense of Person, as would
be necessary to justify the appellant's conduct in this case. Because we find that the appellant has not introduced
evidence to support each element of Self-Defense, we need not proceed to consider Deadly Force in Defense of
Person. 
98. See Lockhart v. State, 857 S.W.2d 568, 574-75 (Tex. Cr. App. 1992) (finding that evidence did not
sufficiently raise self-defense where the appellant initiated the altercation that resulted in a police officer's death,
there was no evidence that the appellant attempted to abandon the encounter, the officer did not use excessive force,
and the appellant's resistance was unreasonable). 
99. 983 S.W.2d 249 (Tex. Cr. App. 1998).
100. Id., at 262.
101. While both the appellant and the State ascribe the testimony at issue to Officer Wilcox, it is actually the
testimony of Officer Foster that is cited and discussed.
102. The State argues that the testimony supports future dangerousness by reflecting "the fear [Officer
Wilcox] felt as a victim of appellant's threats to kill him." The State again appears to confuse the two officers. But,
the testimony may support future dangerousness by showing that Officer Foster did take the appellant's threats
seriously, contrary to the suggestion of defense counsel.
103. See also Tex. R. Evid. 103(a).
104. Blue, 125 S.W.3d, at 493.
105. Berry v. State, 233 S.W.3d 847, 860 (Tex. Cr. App. 2007).
106. In Blue v. State, this Court decided that evidence was legally sufficient to support a finding of future
dangerousness under facts similar to the present case. The appellant in Blue killed his girlfriend by dousing her with
gasoline and setting her on fire. The State showed that the appellant had a history of violence, especially toward
current and former girlfriends. The appellant presented evidence of good character and evidence that he had a drug
and alcohol problem at the time of the offense. He also presented evidence from prison employees that he had no
record of violence for the seven years he was incarcerated on death row after his trial and before a second
punishment hearing. Finally, the appellant's psychiatric expert testified that there was not a statistical probability that
the appellant would commit future acts of violence, and that the appellant's violence was mostly "relationship
driven." On the other hand, the State presented evidence that the appellant was "pounding and screaming" at county
jail personnel while he was incarcerated at that location for his second punishment hearing. We found that the facts
of the offense and the other evidence of appellant's prior history of violence were sufficient to support the jury's
affirmative finding on future dangerousness. 125 S.W.3d, at 496. 
107. 928 S.W.2d 482 (Tex. Cr. App. 1996).
108. Id, at 499; see also Jackson v. State, 992 S.W.2d 469, 481 (Tex. Cr. App. 1999). 
109. 232 S.W.3d, at 100-08. The appellant's counsel on appeal was also appellate counsel for Saldano.
110. Clear artifacts from Saldano remain, such as outdated citations to authority, misnumbered special issues,
and quotations from the jury charge in Saldano, which was different from the charge in the present case.
111. 232 S.W.3d, at 108.
112. Id., at 107.
113. Id., at 108-09.